## A. L. SMITH IRON CO. v. DICKSON.

### No. 235.

Circuit Court of Appeals, Second Circuit.

Feb. 29, 1944.

4

Hector M. Holmes, of Boston, Mass., for plaintiff.

Theodore S. Kenyon, of New York City, for defendant.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

Both parties appeal from a judgment, enjoining the defendant after a trial from misusing Patent No. 1,864,232, issued to Harry Cocks on June 21, 1932, for ships' hatch covers; but dismissing the complaint so far as it sought a declaration that the patent was invalid. The facts were as follows. The patent had two claims: one, for putting an iron band around the ends of two or more timbers, placed side by side and together forming a hatch cover. These bands act as a protective shoe, and are countersunk so that the timbers lie flush upon the ledge of the coaming. The second claim was similar, except that, in addition, metal plates are placed between the timbers with bolts to hold the members together. Cocks is a British subject, and on April 1, 1942, a British corporation to which he had assigned the patent, gave Dickson a license to manufacture and sell the patented covers and the "End Shoes and Bands within the United States of America for the term of ten years" at a royalty of four pence for every "shoe or band" made or sold. Dickson was to have no right to grant sub-licenses except by consent, and was not to "do or permit to be done any act or thing with respect to said letters patent which shall * * * in any way prejudice the rights of the Licensors therein or the benefits and advantages conferred on the Licensors". Dickson never made hatch covers, but he did make and sell the bands in large numbers until November, 1942, since when he has ceased altogether. In spite of the contract, on June 23, 1942, without the consent of the Cocks company he granted an exclusive license to a California company "to manufacture, sell, and dispose of hatch cover bands" within a specified territory, reserving certain privileges to himself; and on October 26th he granted a similar license to a New Jersey company, and still a third to a New York company on November 10th. In all these he reserved a royalty of thirty cents to himself with certain exceptions not important here. Some time in November or December he learned that the plaintiff was selling bands, fitted as parts of the patented hatch covers, to persons who were using them to make such covers, and on December 3rd, he wrote a letter to it, suggesting that it might be selling the bands "without realizing that a band for a wooden hatch cover is covered by a patent issued to Mr. Harry Cocks * * * under U. S. A. Patent No. 1,864,232, and therefore any sale of this band would be a violation of the patent." He added that a letter of the plaintiff to one of his customers, was "particularly interesting when you state that you had been furnishing Hatch Bands. In that case there would be a distinct violation. We trust you will let us know your attitude in the matter, as we have Mr. Cocks' instructions that his patent is to be protected at any cost." The plaintiff answered on December 7th, asserting "that the Cocks patent does not cover a band, but that the coverage is limited to a hatch cover made in a certain way * * * there can be no liability on our part for the sale of a common article of merchandise like a metal band, which is unpatented, any more than for the sale of the planking or the screws." Dickson replied on the 8th, that although nothing could prevent the plaintiff from "making a band", nevertheless, "you put your customers in an awkward position because the minute they put that band on a hatch board they violate the Cocks patent. It is a doubtful question whether the fact that you sell these bands for a specific purpose is a violation of the patent or not, but is it quite fair to your customers to offer these for sale, knowing that they are going to get into trouble when they use them?"

The plaintiff filed its complaint in this suit on the 25th of January, 1943, and served Dickson on the next day. Dickson informed the Cocks company of the suit, which on the second of February gave him the required consent; and armed with it on the 20th of April he granted a new sub-license to the New York licensee, and on the first of May, one to the California licensee. These were somewhat different from the first; they recited that Dickson was "the owner of full license and authority

throughout the United States and power to grant sub-licenses"; and that by virtue of this he granted to the New York licensee an exclusive, and to the California licensee a non-exclusive, license "to make, use and sell Hatch Covers," over a specified territory of the United States; the licensee to pay forty cents for each hatch cover, "sold, shipped or put to use." Both licensees manufactured hatch bands, but neither manufactured covers. At about the same time Dickson wrote to eight manufacturers of hatch covers in the United States, offering them a non-exclusive sublicense to manufacture the covers, in which he declared that the "Licensee shall have the right to obtain hatch cover bands used in the manufacture of Hatch Covers under this sublicense, from any source whatsoever". By these changes made after the action was begun he sought to undo the effect of any unlawful extension of the Cocks patent to the bands as distinct from the patented hatch covers. He does not upon this appeal seek to support his original position that the patent prevented the plaintiff's sale of the bands alone.

The complaint demanded judgment enjoining Dickson from asserting that the patent covered the bands, and from threatening it for selling, or its customers for buying, them; adjudging that the patent was invalid and that the plaintiff did not infringe it; and asking other relief, not necessary to state. The judge thought that Dickson's efforts to "purge" himself of his original misuse of the patent had not been sufficient, and therefore entered judgment forbidding him to cause any suit to be brought under the patent, so long as he continued "to combine the sale of reenforcing bands for hatch covers with a license, express, or implied, under said Cocks patent, * * * until the consequences of defendant's illegal conduct have been fully dissipated." On the other hand, he dismissed the complaint so far as it sought a judgment determining the validity of the patent, because the Cocks company was not a party; relying for this upon our decision in Contracting Division v. New York Life Insurance Company, 2 Cir., 113 F.2d 864. Each party appealed from that part of the decree which was against him;

but for reasons that will appear, it will not be necessary now to decide Dickson's appeal.

Dickson could not have sued upon the Cocks patent in his own name; as a mere licensee—and, at that, only a licensee to make and sell—he was not within the doctrine of Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923; both parties are in accord so far. However, in his letter of December 3rd he had asserted that he had "Mr. Cocks' instructions that his patent is to be protected at any cost"; and his letter of December 8th, taken in connection with that of the 3rd, very plainly threatened suit against the plaintiff's customers, if they should use upon hatch covers any of the bands which they had bought of it. Therefore, it makes no difference whether or not the Cocks company had authorized him to bring a suit in its name; though perhaps the clause in the contract that he should not "permit to be done any act * * * which shall * * * in any way prejudice the rights of the Licensors," went so far. Whether it did or not, he meant the plaintiff to understand that he had such a power, and that he proposed to use it. Besides, he was issuing licenses to makers of the bands and taking royalties; nothing could be a clearer assertion of his purpose to insist upon a monopoly of their sale, and later of the manufacture of hatch covers. The plaintiff was therefore confronted with a direct attack upon its business. Against this it had two defenses: if its customers were sued, it could intervene and try to get the patent declared invalid; or it might seek an injunction against any further threats against them or itself based only upon the sale of the bands. The second would not be a final disposition of the controversy, for Dickson could correct his practices—as he has tried to do—and after a season of "purgation," he could sue those customers who used the plaintiff's bands in the only way they were useful. On the other hand, it was doubtful whether the situation had yet developed far enough for it to sue him for the wrong of threatening suit and not following up his threats—a wrong recognized in those decisions which we cite in the margin.[1] The situation was therefore

[1] A. B. Farquhar Co. v. National Harrow Co., 3 Cir., 102 F. 714, 49 L.R.A. 755; Adriance, Platt & Co. v. National Harrow Co., 2 Cir., 121 F. 827; Racine Paper Goods Co. v. Dittgen, 7 Cir., 171 F. 631; United States G. & P. E. Corp. v. Hanson-Van Winkle-Munning Co., 4 Cir., 104 F.2d 856, 862; Art Metal Works v. Abraham & Straus, 2 Cir., 107 F.2d 944; Betmar Hats v. Young America Hats, 2 Cir., 116 F.2d 956.

6

clearly ripe for a declaratory judgment as to the validity of the patent, and it was an error to dismiss this part of the complaint, unless the Cocks company was a necessary party to any judgment determining the validity of the patent.

It is of course true that no such judgment would conclude the company, and that at any time thereafter it could sue the plaintiff's customers. Nevertheless, every patent owner has an interest in keeping the reputation of his patent from the stain of a judgment of invalidity—an interest which it is proper for a court to recognize. In the case at bar the Cocks company can avoid that prejudice by intervening in this action; and indeed it must be given the opportunity to do so. That being true, its only interest in the dismissal of the complaint is the interest of every patent owner in the choice of the forum in which, and the time at which, he will assert his rights. That too is an interest proper to be weighed against the plaintiff's interest in settling its present controversy with Dickson. Yet, even though the Cocks company had done nothing more than license Dickson, the scales, so balanced, would tip to the plaintiff's side; for it would be obviously unfair to leave its business exposed to continuous indirect attack, merely to preserve the company's choice of forum—at least when, as here, the forum open to it is a court having jurisdiction over patents. But the case is stronger for the plaintiff than that, for the Cocks company went further than merely to license Dickson; it not only exacted a promise from him not to "permit" its interests to be "prejudiced," but it has now authorized him to issue such licenses under its patent. It has plainly used him to enforce its patent, and if it has not surrendered its choice of a forum, at least its interest in that choice has dwindled too much to stand against the plaintiff's.

The ordinary case of a suit by a licensee against an infringer is in no sense the same. It is indeed true that a mere licensee may have an interest at stake in such a suit; his license may be worth much more to him than the royalties which he has agreed to pay, and its value will ordinarily depend on his ability to suppress the competition of his rivals. The reason why he is not permitted to sue is not because he has nothing to protect. But against that interest is the interest of the infringer to be immune from a second suit

by the owner of the patent; and also the interest of the patent owner to be free to choose his forum—the same interest which exists here. Indeed, the owner may have granted a number of licenses, and it would be exceedingly oppressive to subject him to the will of all his licensees. These two interests in combination have been held to overweigh any interest of the licensee; and whether or not that conclusion was right, it is at least clear that there is no comparison between that situation and the one at bar. As res integra there can therefore be no warrant for making the presence of the Cocks company a condition upon this action.

The judge thought, however, that he was bound to hold otherwise because of our decision in Contracting Division v. New York Life Insurance Company, supra, 113 F.2d 864. At first blush that may not seem unreasonable; but a careful analysis makes it clear, we think, that that decision is in entire harmony with what we have just said, both in result and in reasoning. The action there at bar was the usual one for infringement, brought by a corporation, claiming to be the owner of the patent. After it had been begun, this corporation to its surprise found that it had assigned the patent to its parent corporation, taking back only a license. It is true that it did not then discontinue the suit, but pressed it to a conclusion; but this it did not do in its right as licensee; that it never asserted at any time; indeed it may be said to have conceded that it could not prosecute as licensee. On the contrary, its position was that its assignee and itself were so inextricably fused that they did not exist as separate juristic persons at all; and that the assignment was therefore mere form, and a nullity. We held that the two corporations were not fused and that therefore the plaintiff, as licensee only, had no capacity to sue under the well settled doctrine. The defendant had filed a counterclaim, seeking a declaration that the patent was invalid, and this we dismissed, not on the merits, but because the owner of the patent was not a party. There can be no question that we were right in doing so, since, as we have just said, the plaintiff had never claimed the right to sue as licensee, but only as owner; and so, as soon as we had decided that it was not an owner, all controversy between it and the infringer necessarily ended. The owner being absent, the situation became the same as though an entire stranger to the patent

had brought the suit, in which event obviously no counterclaim would have lain. In Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450, the Supreme Court recognized that, when no question remained to be decided the court should not determine the validity of a patent, citing (p. 363)—apparently with approval—our decision in Cover v. Schwartz, 133 F.2d 541.[2] But it then went on to do what we are doing here, and for the same reason: since there was a controversy between the parties which remained undecided, it retained jurisdiction over the parties to decide it. Such a controversy remains undecided here, because, unlike the plaintiff in Contracting Division v. New York Life Insurance Company, supra, 133 F.2d 864, Dickson persists in his claim to assert the patent as licensee (and apparently also by virtue of some added authority to act for the Cocks company), and in that role threatens the plaintiff's customers.

The judgment, so far as it denied the prayer for a declaratory judgment, must therefore be reversed; yet on this record we will not undertake to adjudicate the validity of the patent. The parties have not presented their arguments on that issue; and they may wish to put in further evidence. More important still, the Cocks company must be given the opportunity to appear and protect the patent. Lastly, the question arises whether that part of the judgment should stand which enjoined Dickson from causing suit to be brought upon the patent so long as he continues "to combine the sale of re-enforcing bands * * * with a license * * * under said Cocks patent," and "until the consequences of the defendant's illegal conduct have been fully dissipated." Such an injunction will be unnecessary, if the patent proves invalid, since an injunction will then go against making any claim under it whatever. If on the contrary the patent proves valid, it will be only after a trial, by which time it is possible that the whole situation will have taken on an entirely different aspect. We think it best therefore to reverse this provision of the judgment as well; it being understood that we are not deciding whether Dickson's change in licensing has sufficiently removed the objectionable features of his former practices; or whether the plaintiff will in any event be entitled to any damages. The law on that whole subject is obviously still in

flux, and it is undesirable to decide questions which may in the end prove moot. On the other hand, it will be proper to retain the temporary injunction until the issue of validity has been decided; the patent has never been adjudicated, and until it has, Dickson should not be allowed to use it except in accordance with the limitations which the district court imposed upon him pendente lite.

Judgment reversed; cause remanded.

---

[2] Certiorari denied 319 U.S. 748, 63 S.Ct. 1158.