**MICRO–ACOUSTICS CORPORATION, Plaintiff,**

v.

**BOSE CORPORATION, Defendant.**

**Nos. 79 Civ. 102 (WCC), 79 Civ. 124 (WCC).**

United States District Court, S. D. New York.

June 10, 1980.

As Amended June 19, 1980.

Kenyon & Kenyon, New York City, for plaintiff; Charles R. Brainard, John A. Fogarty, Jr., Philip J. McCabe, Herbert H. Plever, New York City, of counsel.

Wikler, Gottlieb, Taylor & Howard, New York City, for defendant; Leonard H. Moche, New York City, Charles Hieken, Waltham, Mass., of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This is an action for a declaratory judgment that U.S. patent No. 4,133,975 ("the '975 patent"), relating to a loudspeaker system, is invalid and has not been infringed by plaintiff's FRM–3 loudspeaker, and for alleged unfair competition in making unjustifiable charges of infringement and threats of suit against plaintiff and its customers. The action is presently before the Court on (1) the motion of defendant Bose Corporation ("Bose") to dismiss the complaint for lack of an allegedly indispensable party, namely the patent owner, defendant's wholly owned subsidiary, Bose Products, Inc. ("Bose Products") or, in the alternative, to transfer the action to the District of Massachusetts, where defendant has its principal place of business and (2) the motion of plaintiff Micro-Acoustics Corporation ("Micro-Acoustics") for a partial summary judgment of non-infringement on the alleged ground that the patent claims could not be interpreted broadly enough to cover the FRM–3 speaker without being rendered invalid in view of a German patent application published in 1959.

Defendant's motion must, of course, be considered first because, if it is granted, the Court will be ousted of jurisdiction to rule on plaintiff's motion.

## DEFENDANT'S MOTION

*The relevant facts*

There is no dispute as to the following facts:

Defendant Bose is a Delaware corporation with its principal place of business in Framingham, Massachusetts. It was founded in 1964 by Dr. Amar G. Bose ("Dr. Bose") who then was and still is a Professor of Electrical Engineering at Massachusetts Institute of Technology. Its business is the development, manufacture and sale of loudspeakers and related audio products. Dr.

Bose has been chief executive officer of Bose since its inception, while continuing full-time teaching duties at M.I.T.

After developing and marketing several larger, more powerful and expensive speaker systems, including the Models 901 and 501, Bose developed the system disclosed in the patent in suit and began marketing it as the Model 301. The original application for the patent in suit, Serial No. 564,543, was filed several years earlier on April 2, 1975 in the name of a Bose employee, Charles Barker III, who assigned it to Bose. The parent application was ultimately abandoned in favor of a continuation application Serial No. 762,017, which was filed on January 24, 1977 and was also assigned to Bose. Both assignments to Bose were recorded in the U.S. Patent and Trademark Office ("PTO").

In August 1977, Bose incorporated a subsidiary, Bose Products, to manufacture the speakers for sale by Bose. Bose Products is a Delaware corporation whose principal office and only manufacturing plant are located in Toa Baja, Puerto Rico; its only other place of business consists of rented warehouse space in Massachusetts.

All of the capital stock of Bose Products is owned by Bose and the officers and directors of the parent company hold the identical positions in the subsidiary. Bose is the only customer for the products made by Bose Products and Bose Products is Bose's only source of such products.

In an Asset Transfer Agreement signed in November 1977, Bose assigned the Barker continuation application Serial No. 762,-017 to Bose Products, along with other assets, and Bose Products agreed not to assign the application or any patent issued thereon except back to Bose. In consideration for this transfer, Bose obtained all of the capital stock of Bose Products.

The continuation application was allowed on October 4, 1978. Not only had the assignment to Bose Products never been recorded in the PTO, but at the time of paying the issue fee on October 10, 1978, Bose's attorney notified the PTO that the application was owned by Bose. The '975

patent accordingly issued with Bose named as assignee.

Bose remained the record owner of the patent not only up to the time of filing of this action on January 8, 1979, but at least up until October 1979 when defendant filed its Memorandum in Support of the Motion to Dismiss, asserting that a document confirming the 1977 assignment "is being mailed to the PTO for recording."

Bose, in its Answer and Counterclaim filed February 13, 1979, did not expressly deny the allegation of the Complaint that it was the owner of the '975 patent but merely responded that "a wholly owned subsidiary of Bose is the owner of the '975 patent." Without joining Bose Products, it counterclaimed against plaintiff for alleged infringement of the patent, seeking on its own behalf "an injunction against continued infringement, an accounting for damages, attorneys' fees, * * * interest and costs * * * and * * * other relief * * *."

It was not until a pre-trial conference in March 1979 that Bose's counsel informed the Court that it intended to move to dismiss the action for non-joinder of Bose Products or, in the alternative, to transfer the action to the District of Massachusetts.

Micro-Acoustics began marketing its accused FRM–3 loudspeaker in mid-1976. About a year later, in August 1977, Bose brought an action against Micro-Acoustics in the United States District Court for the District of Massachusetts for alleged unfair competition under state law and under the Lanham Trademark Act of 1946, 15 U.S.C. § 1125(a), *inter alia*, charging that the design of the FRM–3 speaker so duplicated non-functional features of Bose's Model 301 speakers as to cause confusion respecting the source of the products and loss of sales and good will by Bose. That action is still pending.

After the continuation application for the '975 patent was allowed by the PTO but before issuance of the patent, Bose's attorney telephoned counsel for Micro-Acoustics and charged that the FRM–3 infringed the

allowed claims of the application and threatened to sue Micro-Acoustics for patent infringement if the sale of the FRM–3 continued; these threats were repeated in letters written on December 5 and 12, 1978. As a result of such threats, on January 8, 1979, one day before the patent issued, Micro-Acoustics brought the present action. In its answer and counterclaim, Bose has admitted the existence of a justiciable controversy between it and Micro-Acoustics concerning the validity of the '975 patent and its infringement by the FRM–3 speakers. Indeed, on January 9, 1979, the day the patent issued, Bose sent letters to two customers of Micro-Acoustics, Tech Hi Fi and Stereo Warehouse, threatening them with patent infringement actions if they continued to sell the accused Micro-Acoustics speaker. The latter customer wrote Bose, apologizing for having "infringed on Bose patent rights" and promising to "discontinue the advertising of Micro-Acoustics speakers."

*Contentions of the parties*

Relying on *Contracting Division, A.C. Horn Corp. v. New York Life Ins. Co.*, 113 F.2d 864 (2d Cir. 1940), Bose contends that the action cannot be maintained in the absence of the patent owner, Bose Products, which is an indispensable party.

Bose adds that Bose Products may not be added as a party defendant in this action because it does no business in New York. As an alternative to dismissal of the action, Bose asks that the action be transferred under 28 U.S.C. § 1404(a) to the District of Massachusetts where both Bose and Bose Products are doing business, and where Bose's "related" unfair competition action against Micro-Acoustics is pending.

Micro-Acoustics responds that Bose Products is not an indispensable party on the declaratory judgment count because Bose is, in practical effect, an exclusive licensee under the '975 patent with the right to sue for infringement thereof, and has actually been asserting such right not only in its letters to Micro-Acoustics and its customers but also by its counterclaim in this action; that, even if Bose Products might have

been deemed an indispensable party, the Court should exercise its discretion under Rule 19(b), F.R.Civ.P., to proceed without it; and that Bose Products is in any event not an indispensable party to the unfair competition count since the charges and threats which form the basis of that cause of action were made by Bose itself.

*Discussion*

Under the Asset Transfer Agreement, Bose clearly has all the rights of an exclusive licensee under the '975 patent, and more. Although Bose Products holds the legal title to the patent, and has the right to manufacture the patented speakers, it cannot sell them to anyone other than Bose, which has the exclusive right to sell them. Moreover, unlike the usual exclusive licensor, Bose Products cannot even dispose of its interest in the patent to anyone except Bose.

Even if Bose Products were not a wholly owned subsidiary of Bose, the latter would seem to have, at the least, all the attributes of an exclusive licensee. When it is considered that, in addition, Bose Products is owned outright by Bose, and that the same persons hold the same offices in the two companies, so that Bose Products can do absolutely nothing without the knowledge and acquiescence of Bose, it is clear Bose Products has as naked a legal title as could be imagined.

■ It is hornbook law that an exclusive licensee has the implied power to sue for infringement of the licensed patent, without the consent of the patent owner, and to join the owner as an involuntary plaintiff. *Independent Wireless Telegraph Co. v. Radio Corp.*, 269 U.S. 459, 469, 46 S.Ct. 166, 169, 70 L.Ed. 357 (1926); *Radio Corp. v. Emerson*, 296 F. 51, 54 (2d Cir.), *cert. denied*, 265 U.S. 582, 44 S.Ct. 456, 68 L.Ed. 1190 (1924).

■ It follows that an exclusive licensee who has created a justiciable controversy by charging another with infringement of the licensed patent may be sued by the accused infringer for a declaratory judgment of invalidity and/or noninfringement of the pat-

ent, without joining the owner. *Caldwell Mfg. Co. v. Unique Balance Co.*, 18 F.R.D. 258 (S.D.N.Y.1955).

■ The Court concludes that Bose Products is not an indispensable party. Moreover, even if it might have been so regarded, the Court would be disposed to entertain the action under the discretion conferred on it by Rule 19(b), F.R.Civ.P.

Rule 19(a) provides in part:

"A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest."

Rule 19(b) adds:

"If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."

It is clear that proceeding in the absence of Bose Products will prejudice no one; that a judgment declaring that the '975 patent has not been infringed by the FRM–3 speaker and that Bose was guilty of unfair competition in threatening infringement litigation against Micro-Acoustics and its customers will afford Micro-Acoustics adequate relief; and that while Micro-Acoustics would have an adequate remedy if it were forced to litigate in Massachusetts, that forum is obviously less convenient for it.

Bose has not only threatened to sue Micro-Acoustics for infringement of the '975 patent; in its counterclaim, it has actually done so. The present action is in these respects similar to *Capri Jewelry v. Hattie Carnegie Jewelry Enterprises*, 539 F.2d 846 (2d Cir. 1976). There, Hattie Carnegie, a non-exclusive licensee under a patent on novelty jewelry, had threatened to sue Capri and its customers for infringement of the patent, and had actually joined with the patent owner, Bill James, in suing one such customer, Gimbel's. Capri brought an action in New York against Hattie Carnegie for declaratory judgment, but could not join James, who was a California resident. After the District Court granted a declaratory judgment of non-infringement, Hattie Carnegie argued on appeal that the patent owner, James, was an indispensable party.

The Court of Appeals rejected that contention, Judge Friendly stating:

"The question is whether the court properly exercised its discretion under F.R.Civ.P. 19(b). We think it did; see 3A Moore, Federal Practice ¶ 19.14[2.–3] (1974). The Notice by which Hattie Carnegie precipitated the controversy stated that it would take immediate legal action 'both individually and in consort with the licensor.' Evidence that this assertion was not unauthorized by the licensor is furnished by the fact that only a fortnight later they did exactly what had been threatened, by jointly suing Gimbel's for infringement. Counsel representing Hattie Carnegie in this suit are acting both for it and for James in the infringement suit." 539 F.2d at 853.

The court distinguished the *A. C. Horn* case relied on here by Bose:

"Hattie Carnegie places great store on our decision in *Contracting Division, A. C. Horn Corp. v. New York Life Ins. Co.*, 113 F.2d 864 (1940), that a claimed infringer could not counterclaim for a declaration of non-infringement against a non-exclusive licensee without the presence of the patent owner since there was no 'actual controversy' such as the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, requires. However, the *A. C. Horn* decision was soon distinguished in *A. L. Smith Iron Co. v. Dickson*, 141 F.2d 3 (2 Cir. 1944). Dickson, a non-exclusive licensee of a British patentee, advised A. L. Smith that the latter was selling products infringing the patent, that the patent owner had instructed that the patent was 'to be protected at any cost,' and that A. L. Smith's purchasers were 'going to get into trouble.' Reversing a district court decision that had relied on *A. C. Horn*, this court held that Dickson was not entitled to have A. L. Smith's action for a declaration of invalidity dismissed because of the absence of the patent owner. Judge Learned Hand said:

> Yet, even though the Cocks company had done nothing more than license Dickson, the scales, so balanced, would tip to the plaintiff's side; for it would be obviously unfair to leave its business exposed to continuous indirect attack, merely to preserve the company's choice of forum—at least when, as here, the forum open to it is a court having jurisdiction over patents.

We find *A. L. Smith* very pertinent here." 539 F.2d at 852–53.

The instant case presents a much more compelling situation for the exercise of the Court's discretion under Rule 19(b) than either *A. L. Smith* or *Capri Jewelry*. Here Bose has held itself out to the world as the owner of the '975 patent. The agreement by which Bose assigned the patent to its wholly owned subsidiary was kept secret for years. Not only was the agreement not recorded in the PTO, but at the time of paying the issue fee Bose falsely represented to the PTO that it was the owner of the patent application, thus causing the patent to issue in its name. Moreover, unlike Hattie Carnegie, when Bose counterclaimed against Micro-Acoustics for infringement of the patent, it did so without even bothering to join the patent owner.

On top of all this, Bose, unlike Hattie Carnegie, has total control over the patent owner. It has the power, if it wishes, to cause the patent owner to bring a separate action for infringement of the patent or to join in the present action. Indeed, because the same attorney who represents Bose in this action would apparently also represent Bose Products if it intervened, the presence of Bose Products would not change the course of the action in the slightest degree. The argument of Bose that proceeding without Bose Products would "violate due process" is wholly unconvincing.

There is therefore no conceivable reason for exalting formalism over substance and dismissing the action in view of the nonjoinder of Bose Products. The motion of Bose to dismiss the complaint will accordingly be denied.

The alternative motion of Bose to transfer the action to the District of Massachusetts under 28 U.S.C. § 1404(a) will also be denied. Bose has made only the most perfunctory pass at establishing that any of the factors which have been recognized by the courts as favoring such a transfer are present in this case. See *Interested Underwriters at Lloyds v. Dennis H. Finney*, No. 79 Civ. 4787 (S.D.N.Y., filed May 29, 1980) (Conner, J.); *Car-Freshner Corp. v. Auto Aid Mfg. Corp.*, 438 F.Supp. 82 (N.D.N.Y. 1977). Bose merely asserts that it and its attorney are located in Massachusetts and that there is a "related" action between the parties pending there. The factor of Bose's residence is perfectly counterbalanced by the fact that Micro-Acoustics, a New York corporation, has its principal office in Elmsford, Westchester County, less than 25 miles from the Courthouse where this Court sits, and its attorneys are located in New York City within one-half mile of the Courthouse.

The pendency of the Massachusetts action is not a significant reason for transfer since

that action and this one involve entirely different issues and different proofs, and no economies would result from consolidating the two cases for trial.

■ Bose's further contention that the action should be transferred because any decision reached in this Court in the absence of Bose Products will not bind all the interested parties is not persuasive. Where the patent owner has actual notice of an action in which its exclusive licensee is asserting the validity and infringement of the licensed patent, it cannot stand aloof from the litigation and thereby escape being bound by the judgment. *Independent Wireless Telegraph Co. v. Radio Corp., supra*, 269 U.S. at 473–74, 46 S.Ct. at 171. *A fortiori* where, as here, the owner is wholly owned and controlled by the exclusive licensee.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

*The relevant facts*

The following facts are not disputed:

The '975 patent related to a loudspeaker which is intended for use as one of a pair of loudspeakers in a stereophonic sound system. Each loudspeaker, in its simplest form, consists of two drivers, a low-frequency driver or "woofer" and a high-frequency driver or "tweeter." The audio-frequency response curves of the woofer and tweeter overlap, so that each reproduces some audio frequencies within the adjacent portion of the frequency range of the other. An electrical circuit called a "cross-over network" divides the audio signal into low- and high-frequency components and couples them respectively to the woofer and tweeter.

In the parent application Serial No. 564,-543 as originally filed, the principal emphasis was on the directional orientation of the woofer and tweeter and the characteristics of the cross-over network.

The specification points out that the desirable objective of producing a "widely diffused spatial image," *i. e.*, the sensation of sound emanating from a broad source rather than a single point, is achieved by causing the high-frequency components, which are of greater significance in "auditory localization," to be reflected from the sidewalls of the listening room. This is accomplished by mounting the tweeter on an obliquely oriented vertical baffle so that its radiation is directed not only forwardly toward the listener but also laterally against the sidewalls of the room from which they are reflected to the listener. The overlapping of the frequency ranges of radiation from the woofer and tweeter is said to produce "fusion of the sonic image" and thereby to prevent the high-pitched instruments from sounding "far away and smeared" and to maintain the desired "crispness."

The "Summary of the Invention" describes this arrangement and specifies that the frequency ranges for the woofer and tweeter overlap "for at least a half octave." As an optional added feature, the Summary describes "another aspect of the invention" consisting of an "adjustable deflector means intercepting the energy radiated by the [tweeter] for directing the high-frequency energy radiated therefrom in a predetermined direction."

The principal embodiment of the invention, shown in Figures 1 and 2, does not include the "deflector means," which is incorporated only in the alternative embodiment of Figure 3. The deflector means shown consists of a vane mounted on a vertical rod which extends through and is rotatably supported by the upper wall of the speaker cabinet and has a control knob fixed on its upper end for rotation of the deflecting vane. The vane is positioned in front of the tweeter, which is mounted on a fixed, vertical supporting baffle extending obliquely across a front corner of the cabinet so that the maximum of radiation of the tweeter is directed obliquely outwardly and forwardly. The woofer is mounted on the front baffle of the cabinet with its maximum of radiation directed forwardly.

The deflecting vane is described as controlling the amount of high-frequency energy radiated directly to the listener so that

the listener is caused to perceive the sound as coming from a broad source.

The original application contained 16 claims, all of which were directed to the overlapping frequency response characteristics of the two drivers and of the cross-over network. Only six of the claims, numbers 6, 7 and 10 through 13, included the adjustable deflecting means, and all of them were dependent on claims directed to the overlapping frequency response feature.

In the first official action, mailed December 24, 1975, all of the claims were rejected as unpatentable in view of the prior art, with the exception of the dependent claims 11–13, which included the movable deflecting means, and which were indicated to be allowable if amended to place them in independent form. In the second official action, mailed June 16, 1976, the rejection of the claims which did not include the movable deflecting means was made final.

As previously mentioned, about August 1976 Micro-Acoustics started marketing its FRM–3 speaker. The FRM–3 does not include any movable deflecting vane. Instead, the tweeter itself is bodily rotatable in a horizontal plane, being mounted at the lower end of a vertical rod which extends through and is rotatably supported by the upper wall of the cabinet and has a control knob fixed on its upper end.

Bose apparently learned of the FRM–3 shortly after its introduction and initiated an unremitting effort to obtain claims broad enough to cover not only the movable deflecting vane shown and described in the patent specification and drawings but also the rotatable tweeter of the FRM–3.

On November 1, 1976 Bose filed a second amendment adding 14 new claims including only one independent claim, number 17, and 13 other claims, 18 through 30, dependent on it. Claim 17 called for a "tweeter means * * * having a maximum directed both sideward and forward of said front baffle" and a "knob means" supported by the top panel of the cabinet and concluded with the following language obviously intended to cover the change in the direction of the high-frequency sound radiated by the tweeter either by rotating a deflecting vane in front of the tweeter or by rotating the tweeter itself:

> "and means including said knob means for selectively positioning said maximum of radiation between a front end position with said direction of radiation more forward than sidewards and a side end position with said direction of radiation more sideward than forward."

In the Remarks to this amendment, Bose's attorney stated that the new claims were being presented because

> "applicant's assignee only recently became aware of a copy of the Bose Model 301 loudspeaker system incorporating at least the features of claim 17 and most of the other claims dependent thereon. Upon review it was discovered that applicant appeared to be entitled to claims of the scope of claims 17–30 that would cover the copy, and claims of this scope had been inadvertently omitted from the application as filed."

The reference to the Micro-Acoustics FRM–3 as a "copy" of the Bose Model 301 is dubious, to say the least, since the FRM–3 has no deflecting vane, movable or fixed.

In a letter mailed December 7, 1976, the PTO refused to permit any of the proposed amendments after final action because, *inter alia*, "They raise new issues that would require further consideration and/or search."

In order to press the broader claims, Bose thereupon filed a continuation application which carried forward all of the claims of the original application and, in an amendment filed before the first official action, Bose added the 14 new claims which it had unsuccessfully attempted to add to the original application by the proposed amendment after final action. In the "Remarks" to this amendment, the only reference to these new claims was the following sentence:

> "New claims 17–30 have been added to define with particularity certain features of the invention."

There was no suggestion that these new claims were intended to cover a speaker

having a rotatable tweeter, nor was there any reference to the so-called "copy" which Bose had earlier indicated it desired to cover.

In the first official action, mailed July 13, 1977, all of the claims which did not include the movable sound directing means were again rejected. In this action, the Examiner cited for the first time the published German patent application (Auslegeschrift) 1,065,467, which discloses a speaker having a forwardly directed woofer and a pair of tweeters which are bodily rotatable in a horizontal plane. However, this patent was applied by the Examiner only in rejecting the claims directed to a forwardly oriented woofer and a forwardly and sidewardly oriented tweeter with overlapping frequency response characteristics. The Examiner clearly did not appreciate that the new claims 17 through 30 were broad enough to cover a tweeter rotatable in a horizontal plane without a movable deflecting vane, because he did not apply the German reference to those claims but instead indicated that a number of them would be allowable if amended to place them in independent form.

By December 1977, Bose realized that none of the application claims was literally applicable to the Micro-Acoustics FRM-3 speaker, because in the FRM-3 the tweeter is not fixedly mounted on an obliquely angled baffle but instead is rotatably supported in front of a fixed, obliquely angled panel. On January 17, 1978, Bose again amended claim 17 of its application to change the language which had theretofore called for

"an angled baffle adjacent to said front baffle *for supporting* tweeter means" (emphasis added)

to read instead

"an angled baffle adjacent to said front baffle *and to* tweeter means" (emphasis added).

There is no disclosure in the drawings or specification to support any claim to mounting the tweeter *adjacent to* rather than *on* the angled baffle, nor any suggestion of any functional advantage of such an arrangement.

The obvious purpose of the amendment was to cover the Micro-Acoustics FRM-3 speaker, at the expense of rendering doubtful the coverage of Bose's own Model 301 speaker, in which the tweeter is mounted *on* the obliquely oriented baffle.

Indeed, in the accompanying Remarks, Bose's attorney stated:

"Claims 17–30 have been amended to omit an unduly narrowing limitation by calling for the tweeter means being adjacent to the angled baffle instead of on it. One ought not to be able to avoid infringement by appropriating the substance of the invention defined by these claims by arranging the tweeter means adjacent to the angled baffle but not supported on the angled baffle, as, for example, supporting the tweeter from the knob shaft as in the commercially available Micro-Acoustics FRM-3 loudspeaker * * *"

Bose's attorney did not mention that the FRM-3 did not have a deflecting vane at all, nor that the claims were intended to cover a speaker in which there is no vane and the tweeter itself is rotatable.

On the next official action, claims 17–30, directed to selective positioning of the radiation of the tweeter, were allowed and the remaining claims 1–16, directed to the overlapping frequency response feature, were finally rejected. Bose made still another attempt to amend the latter claims, but without success.

Finally, on August 9, 1978, according to an Interview Summary Record prepared by the PTO Examiner, Bose's attorney telephoned the Examiner and

"stated a desire to continue the prosecution of the subject matter of claims 1–16 in a continuation application and to have allowed claims 17–30 pass to issue if the 'knob means' subparagraph of claim 17 could be broadened. The examiner indicated that such a broadened claim would quite possibly not be found to be allowable in view of the art of record, notably German publications 1,065,467 and 973,-

570 in view of U.S. patents 2,073,747 and 2,109,431, not of record but known to the Examiner, which teach other knob constructions for controlling the direction of speaker generated sound."

The Examiner's reference to "other" constructions for controlling the direction of speaker-generated sound strongly suggests that the Examiner still did not appreciate that claim 17 was broad enough to cover at least literally the structure shown in the German patent application 1,065,467 in which the tweeter itself is bodily rotatable in a horizontal plane.

In any event, the Examiner's mention, for the first time, of this German publication in connection with claim 17 was apparently sufficient to cause Bose to forego any further attempts to broaden claim 17 and to file almost immediately, on August 24, 1978, an amendment cancelling all the rejected claims, and rewriting claim 13 in independent form. The application was promptly allowed on September 19, 1978. Applications claims 17–30 became patent claims 1–14 of the patent, respectively, and application claim 13 became patent claim 15.

Claim 1 is the broadest claim of the patent. It reads as follows:

"A loudspeaker system comprising means defining an enclosure having top, bottom, rear and at least one side panel, a front baffle for supporting woofer means for radiating low audio frequency signals and an angled baffle adjacent to said front baffle and to tweeter means for directionally radiating high audio frequency signals, said woofer means supported on said front baffle, said tweeter means supported adjacent to said angled baffle and characterized by a directional radiation pattern having a maximum direction of radiation oriented along an axis directed both forward and sideward of said front baffle, knob means supported by said top panel in the region above said tweeter means, and means including said knob means for selectively positioning said maximum of radiation between a front end position with said direction of radiation more forward than

sidewards and a side end position with said direction of radiation more sideward than forward."

Claims 2–14 are all dependent upon claim 1 and are therefore not infringed if claim 1 is not. Claim 15, the only other independent claim, is clearly not infringed by the FRM–3 speaker since it calls for "a movable sound deflecting panel" adjacent to [the tweeter] for controllably deflecting energy therefrom" and the FRM–3 has no such movable panel.

*Contentions of the parties*

Plaintiff Micro-Acoustics contends that if any of the patent claims 1 through 14 is interpreted broadly enough to cover not only speaker constructions in which a rotatable deflecting vane is positioned in front of the tweeter, as shown and described in the patent drawings and specification, but also constructions in which the tweeter is bodily rotatable, as in the accused FRM–3, such claims would be invalid because they would also read on the 1959 German application 1,065,467; plaintiff further contends that none of the claims could validly cover its FRM–3 speaker, because it merely applies the teaching of the German reference.

Defendant Bose contends that the patent claims are literally readable on the FRM–3; that even if they were not, the rotatable tweeter construction of the FRM–3 is the functional equivalent of the rotatable deflecting vane shown and described in the patent drawings and specification; and that, at the least, there are issues of fact bearing on these matters which preclude the granting of summary judgment.

*Discussion*

It seems clear that, if claim 1 is read literally, its language is fully applicable to the structure of the accused FRM–3 loudspeakers. Plaintiff does not indicate any portion of the claim which is not literally readable in the FRM–3. Instead, it merely argues that the claim cannot thus be read because such a reading would render the claim invalid in view of the German application.

As previously noted, the German publication discloses a speaker system including a

woofer mounted on the front panel of the cabinet, with its direction of maximum radiation oriented forwardly and a pair of tweeters supported near the front corners of the cabinet for rotation in a horizontal plane. The specification explains the purpose of this arrangement as follows:

"It is known that loudspeakers built especially for tones with high frequencies have a radio beam effect due to the nature of these sound vibrations. Because of this there is a risk that an unfavorable acoustic effect will occur depending upon the position of the loudspeaker in the room. To eliminate this disadvantage, several tweeter loudspeakers are usually used in devices of this type, which project in different directions, in order to achieve a sound projection which is as wide and uniform as possible. This solution, however, is only somewhat successful because of completely different local peculiarities * * *.

"The loudspeaker arrangement according to the invention is characterized by combining the following two features:

(a) The tweeter loudspeaker is rotatable around its axis in the vertical and horizontal plane;

(b) The tweeter loudspeaker is slidable in the casing."

Plaintiff's first assertion that if claim 1 of the '975 patent is interpreted to read on the FRM–3 speaker it would also read on the German reference is not strictly accurate. The speaker of the German publication does not include a knob for rotating the tweeter nor an enclosure including "an angled baffle adjacent to [the] front baffle and to [the] tweeter means" both as called for in the claim. The Micro-Acoustics FRM–3 speaker, on the other hand, *does* have both a control knob and an obliquely angled vertical baffle extending across one of the front corners of the enclosure. The tweeter is positioned directly in front of this baffle in the triangular space between the baffle and the adjacent corner of the cabinet.

However, plaintiff's alternative argument that the FRM–3 employs only the technology taught by the German reference comes much closer to the mark. Although, as already noted, the speaker disclosed in the German publication has neither a control knob nor an angled baffle, these omissions are not significant in the present context.

Insofar as the absence of the knob is concerned, nothing could be more obvious than to fix a knob on a shaft to facilitate manual rotation of the shaft. Every layman daily uses such knobs to rotate the shafts of many kinds of electronic components in radios, audio equipment and television receivers, including the channel selector, band and function switches; tuning, volume and tone controls; and so on. The Court has not the slightest hesitance in ruling as a matter of law that patentability cannot be predicated on such a common expedient.

Insofar as concerns the absence of the angled baffle in the speaker of the German reference, it is not at all clear that the presence or absence of this baffle has any acoustical effect on the operation of the tweeter (of course, the baffle acoustically affects the radiation from the woofer, but that effect is old and well known and is not the subject of the patent). Considering the highly directional characteristics of the higher frequency radiations from the tweeter and the fact that the tweeter is mounted in front of the baffle and oriented so that its lobe of maximum radiation is directed away from the baffle, it is highly questionable whether the baffle has any significant effect on the radiation pattern of the tweeter.

If in fact the tweeter in the FRM–3 would function in substantially the same way whether the angled baffle is present or absent, it would then appear that the FRM–3 indeed employs only the acoustic technology taught by the German reference, which includes all of the acoustical elements of the FRM–3 except the angled baffle.

Moreover, even if the angled baffle of the FRM–3 did affect the operation of the tweeter in some unexpected way, this was not anything that Barker invented or even

contemplated. The patent drawings do not show an angled baffle mounted behind and spaced from the tweeter, nor does the specification disclose or suggest any such arrangement. So far as the patent teaches, the only function of the angled baffle relative to the tweeter is to provide physical support. There is not the slightest suggestion that the baffle has any effect on the radiation pattern of the tweeter, which is controlled by a separate rotatable vane.

Thus, to any extent that the patent could be said to teach the technology employed in the FRM–3, that technology is also taught by the prior German reference. Indeed, the German reference is the much better instructor, because it teaches the use of rotatable tweeters, as used in the FRM–3, while the patent teaches only the use of rotatable vanes in front of the tweeters, which the FRM–3 does not have.

While the language of claim 1 has been cleverly chosen to read, at least literally, on both alternatives, the claim cannot be interpreted to cover any speaker, such as the FRM–3 speaker, which incorporates only technology in the public domain.

In *R. H. Baker & Co. v. Smith-Blair, Inc.,* 331 F.2d 506, 509, n. 5 (9th Cir. 1964), the Court approved the following jury instruction:

> "[W]hen a patent expires it becomes part of the public domain and anyone has a right to practice the teachings of the patent. Thus, where a device is found to have been copied from the prior art which is in the public domain, it cannot infringe any other patent."

And in *Reiner v. I. Leon Co., Inc.,* 324 F.2d 648, 651 (2d Cir. 1963), the Court of Appeals for the Second Circuit stated:

> "Because the policy of the law is to construe strictly the grant of a patent monopoly, there is nothing wrong or immoral in any sense for a manufacturer deliberately to create an article on the basis of the prior art in order to avoid infringement. *Eastman Oil Well Survey Co. v. Sperry-Sun Well Surveying Co.,* 131 F.2d 884, 887 (5th Cir. 1942)."

■ The file history of the two applications which ultimately resulted in the patent in suit is a chronicle of doggedly persistent effort to broaden the scope of the claims to cover a method of varying the direction of radiation from the tweeters different from the one disclosed in the specification or drawings and which the inventor and his attorney apparently did not envision until they saw the FRM–3. There is nothing wrong with broadening the claims to cover competitive devices about which the applicant's assignee learns after the application is filed, so long as the claims are supported by the specification and drawings. *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.,* 359 F.Supp. 948, 954 (S.D. Fla.1972), *aff'd* on the opinion below, 479 F.2d 1328 (5th Cir. 1973), although such attempts are viewed critically by the courts. *Honeywell, Inc. v. Sperry Rand Corp.,* 180 U.S.P.Q. 673 (D.Minn.1973). However, in the present case there was simply no way the claims could be validly broadened to cover the competitive FRM–3 speaker because insofar as that speaker could be said to incorporate any technical principle taught by the patent application, that principle was also taught, and much better, by a prior German application. Indeed, the claims surely would never have been allowed in their broadened form if the PTO Examiner had realized that their apparently clumsy language had been carefully chosen to cover a speaker in which the direction of radiation of the tweeters was changed not by a rotatable vane as disclosed in the application, but by bodily rotation of the tweeter itself—a fact which the applicant's attorney carefully avoided mentioning—with the result that the Examiner never applied the German reference to the claims directed to this feature.

■ The Court concludes that the FRM–3 does not infringe any of the claims of the '975 patent.

## SUMMARY

Defendant's motion to dismiss or transfer is denied.

Plaintiff's motion for partial summary judgment is granted.

So ordered.