CAPRI JEWELRY INCORPORATED and Tancer & Two, Inc., Plaintiffs-Appellees,

v.

HATTIE CARNEGIE JEWELRY ENTERPRISES, LTD., Defendant-Appellant,

and

Bill G. James, Defendant.

No. 750, Docket 75–7604.

United States Court of Appeals, Second Circuit.

Argued April 21, 1976.

Decided May 26, 1976.

---

defendant-appellant Hattie Carnegie Jewelry Enterprises, Ltd.

Morton Amster, New York City (Amster & Rothstein, New York City of counsel), for plaintiffs-appellees Capri Jewelry Incorporated and Tancer & Two, Inc.

Before FRIENDLY, HAYS and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

Defendant Hattie Carnegie Jewelry Enterprises, Ltd. (Hattie Carnegie) appeals from an order of the District Court for the Southern District of New York in an action brought against it by two distributors of costume jewelry, Capri Jewelry Incorporated (Capri) and Tancer & Two, Inc. (T&T).

Hattie Carnegie has been licensed[1] by Bill G. James, a resident of California who was named as a defendant but has not been served, to make or have made for it color-change rings under James' Patent No. 3,802,945 (the Patent), entitled "Heat Sensitive Novelty Device." The special appeal of these rings is that changes in temperature activate a change in the color of the transparent "stones"; there is no contention, however, that James invented the basic material having this property, which is commercially available. On September 19, 1975, when plaintiffs were in the process of obtaining orders for their own color-changing rings for the Christmas trade, Hattie Carnegie caused to be published in Women's Wear a notice reproduced in the margin.[2] Eight days later Hattie Carnegie's attorneys sent Gimbel's department store a telegram asserting that "the 'personality ring'

Robert E. Isner, New York City (Nims, Howes, Collison & Isner, and Kenneth R. Umans, New York City of counsel), for

1. Hattie Carnegie insisted on brief and at argument that the license is non-exclusive; plaintiffs intimate that the contrary may be the fact. The record does not firmly establish the answer. The complaint in an action brought by the patentee and Hattie Carnegie against Gimbel Brothers, mentioned below, refers to a license agreement but does not describe it. However, we will assume the point in appellant's favor.

2. 

**NOTICE**

**TO ALL RETAILERS, WHOLESALERS, JOBBERS, MANUFACTURERS AND DISTRIBUTORS**

Notice that HATTIE CARNEGIE JEWELRY and its subsidiaries have been licensed to manufacture, distribute and sell the sensational new stone that changes color according to the emotions of the wearer. This product and the manufacturing process thereof have been granted a patent by the United States Patent Office. We will rigorously defend our rights under this license, both individually and in consort with the licensor. Immediate, severe legal action will be taken against any retailer, wholesaler or manufacturer who may infringe on this federal patent.

HATTIE CARNEGIE JEWELRY ENTERPRISES, LTD.
10 East 38th Street, New York, N.Y. 10016
(212) 725-2600

now being sold by you" infringed the Patent; two days later the attorneys confirmed this in a letter and wrote that unless they obtained immediate assurance of discontinuance of sales, they would take "prompt and stringent action . . . ." No such assurances having been given, James and Hattie Carnegie, on October 2, 1975, brought an action in the Southern District against Gimbel's for patent infringement; they were represented by the same counsel who appear for Hattie Carnegie in this case. The bringing of the action was reported in Women's Wear for October 3. Although Gimbel's rings had been purchased from another supplier, they were manufactured by the same firm that manufactured T&T's rings, and were identical to them. As a result of the article in Women's Wear, T&T was advised by Macy's on October 3 that, unless indemnified by T&T, it would not sell T&T's Personality Ring and would recall an advertisement scheduled for October 5; T&T gave such indemnity.

On September 25, T&T had obtained an opinion of counsel that the Personality Ring did not infringe the Patent, which was also thought to be of "doubtful validity"; T&T made this opinion available to Hattie Carnegie's counsel on October 6, without result. Thereupon Capri and T&T brought this action on October 8.[3] They sought, *inter alia*, a declaration that the Patent was invalid or, alternatively, was not infringed by their rings, an injunction against further threats or the prosecution of actions charging infringement, and damages for unfair competition.

Under the Southern District's Individual Assignment Plan the case was assigned by rotation to Judge Conner, who had been a leading patent lawyer.[4] Along with the complaint Hattie Carnegie's counsel were served with notice of a hearing before the judge at 2:00 p. m. that afternoon, October 9, on plaintiffs' demand for discovery to facilitate their moving for summary judgment. At the request of Hattie Carnegie's counsel the hearing was adjourned until the morning of Friday, October 10. The judge then expressed doubt whether the case was suitable for summary judgment but stated he would give plaintiffs an immediate trial on the issue of infringement. He directed plaintiffs' attorneys to furnish defendant's counsel with specimen rings and instructed the latter to state their position with respect to infringement on October 14. Capri submitted samples of two rings; T&T of one. Defendant conceded that one of Capri's rings did not infringe and a partial consent judgment was entered to that effect; it continued to assert that the other Capri ring and the T&T ring, which were substantially identical, did infringe. Taking out-of-town engagements of defendant's counsel into account, the judge set the trial for October 23.

Prior to trial the judge had studied the Patent, the history of its prosecution in the Patent Office, and a prior art patent, which, as will be seen below, had figured in the prosecution, as well as proposed findings of fact and conclusions of law which the parties had submitted as required by the judge's standing order—a course which, far from being censurable as defendant claims, was a commendable effort by the judge to educate himself on what was to come before him. Before the trial began the judge spoke to both counsel separately in an effort to promote a settlement; defendant's counsel claims that the judge advised that on the basis of his study of the incontrovertible documents mentioned above, he was going to find non-infringement, and suggested the advisability of counsel's settling the case on a basis whereby, in return for defendant's conceding this, plaintiffs would withdraw their damage

---

**3.** The complaint was served on October 9.

**4.** Hattie Carnegie makes some complaint of the fact that the case was not designated as "related" to the suit that it and James had brought against Gimbel's and referred to Judge Pollack, to whom that suit had been assigned. We find nothing in the record to indicate that Hattie Carnegie objected to proceeding before Judge Conner; in any event it is not for us to police the assignment of cases under the District Court's Individual Assignment Plan.

claim.[5] At the beginning of the trial the judge referred to these conferences and remarked that since defendant's counsel were unable to get in touch with their client, they would prefer to go to trial. Defendant's counsel asked that a patent lawyer whom they proposed to call as "a patent expert" be heard first. The judge stated that he would welcome expert help "about the technology" but, in accordance with his announced practice in patent cases, did not require the assistance of an expert in "how to interpret a file wrapper, the legal effect of amending a claim and so forth" since "that is something that counsel can do in their briefs and oral argument just as effectively as a patent expert." Although now protesting this ruling, counsel acquiesced in it at the time. The acquiescence was well advised since the ruling not only was within the discretion afforded by Federal Rule of Evidence 702 with respect to hearing experts but was eminently sensible for a judge who had devoted years to the study of patent claims and file wrappers and to litigation arising from them. The short trial was started and completed on October 23. Plaintiff's counsel having urged that the matter was pressing because of commercial realities, counsel were directed to file briefs by 9:00 a. m. on October 28, and the court rendered its opinion before 5:00 p. m. that day.

Judge Conner found the case with respect to infringement to be an easy one. Referring to his opinion for further detail, we can summarize his analysis as follows: Claim 1 of the Patent reads as follows: [6]

  1. As an article of manufacture, the combination comprising:
  a. a transparent body;

  b. a multiplicity of separately encapsulated droplets of a crystalline liquid encapsulated in turn within said transparent body, said droplets of separately encapsulated crystalline liquid iridescing when subjected to varying temperatures to display through said transparent body varying colors correlated to said varying temperatures;
  c. said transparent body being generally flat and having a peripheral flange defining a recess within said body, said multiplicity of separately encapsulated droplets of crystalline liquid being deposited within said recess; and
  d. means for sealing said recess whereby said encapsulated droplets of crystalline liquid are sealed within the recess of said transparent body.

The nub of the invention, as described in a section of the Patent headed "Summary of the Invention," cited in appellant's brief, was this:

  In terms of broad inclusion, the invention comprises the further encapsulation of the encapsulated droplets of crystalline material *within a transparent body in such a way that* the individually encapsulated droplets of crystalline material will still be responsive to variations in temperature to effect iridescence thereof, and so that the iridescence so formed will be visible to the observer through a transparent body *which effectively seals the encapsulated droplets* of crystalline material from the ambient atmosphere while permitting transmission of light there through. [Emphasis in appellant's brief.]

However, in the accused rings there is no recess in the stone in which the droplets are encapsulated. In T&T's product, the flat

---

**5.** Defendant's counsel asserts the judge said that if, after trial, he should adhere to his view and plaintiffs could sustain their allegation of loss of business from defendant's threats, "he would render a decision which would 'curl' counsel's hair." Our quotation of this does not mean that we accept that it was said. While we are certain the judge's intentions in speaking to counsel separately were of the best, this episode underscores our remarks in *Finley v. Parvin/Dohrmann Company, Inc.,* 520 F.2d 386, 389 n. 4 (2 Cir.1975), as to "[t]he difficul-

ties which even the most innocent form of oral [ex parte] communication may sometimes create."

**6.** The trial court's opinion also considered the possible applicability of Claim 3, which he correctly believed to give even less support to the claim of infringement. Since appellant has been content to argue this appeal on the basis of Claim 1, we see no need for discussing Claim 3.

back of an oval glass stone (a "cabochon"), after being thoroughly cleaned, is painted over with a thin layer of liquid crystal slurry. After being dried, the stone receives a further coat of black paint and is dried again. Meanwhile, an appropriate metal bezel or frame which includes a flat bottom shaped and sized to fit the flat back of the stone and having a short upstanding marginal flange is welded into a ring. Thereafter the stone is secured in the metal bezel by placing a single drop of a commercially available adhesive at the center of the bezel and pressing the stone into it to spread the adhesive over the interface between the back of the stone and the floor of the bezel, with an excess adhesive being extruded into the space at the corners of the bezel. The Capri ring is substantially the same, except that the crystalline and black layers are applied to a thin separate piece of plastic, which is in turn affixed between the stone and the bezel. The judge held that the accused rings did not literally infringe the Patent and that file wrapper estoppel precluded Hattie Carnegie from relying on the doctrine of equivalents.

Little discussion is needed to show the correctness of the conclusion that the accused rings did not infringe the letter of the Patent. Clause c of Claim 1 refers to a "transparent body . . . having a peripheral flange defining a recess within said body"; the accused rings have no "peripheral flange" and indeed no "recess within

said [transparent] body." By the same token they do not provide for the deposit of crystalline liquid within such a recess. There being no recess within a transparent body, the accused rings likewise do not come within clause d, which is stated in the conjunctive. The judge was right in rejecting the contention that the extrusion of a portion of the adhesive between the beveled edge of the stone and the inner corners of the bezel made the enclosed area a recess in the transparent body, as defined in the Patent.[7]

Hattie Carnegie's hopes for success thus had to rest on the doctrine of equivalents. As was classically stated by Judge Learned Hand, this is a principle, peculiar to patent law, whereby "after all aids to interpretation have been exhausted, and the scope of the claims has been enlarged as far as the words can be stretched, on proper occasions courts make them cover more than their meaning will bear." *Royal Typewriter Co. v. Remington Rand, Inc.,* 168 F.2d 691, 692 (2 Cir.), *cert. denied,* 335 U.S. 825, 69 S.Ct. 50, 93 L.Ed. 379 (1948). He went on to note the necessarily imprecise character of the principle, saying:

"All patents are entitled to its benefit to an extent, measured on the one hand by their contribution to the art, and on the other by the degree to which it is necessary to depart from the meaning to reach a just result."

7. Appellant's principal objection to Judge Conner's conclusion on this score is that he limited his written consideration of the specifications to Figures 2 and 3 and the material describing them; the contention is that Figure 4, and its description, should have been considered as well. This Figure was described as a "flat transparent face plate" with a bottom "sealing member," and, the point relied on, a separate "peripheral seal flange," hermetically sealed to the top and bottom members. We think that this language cannot, at one and the same time, be thought to cover the bead of extruded adhesive and also be within a fair reading of Claim 1; and, as we read the opinion, Judge Conner substantially so stated. Indeed, we have trouble reading Claim 1 on this Figure in any case; the language which naturally fits it, identically pictured and described in the original patent application, was contained in James' Application Claim 9, which was stricken from the Patent during prosecution. It claimed:

The combination according to [Application] Claim 1 [i. e., Patent Claim 1, parts a and b], in which said transparent body comprises a flat sheet, said encapsulated droplets of crystalline liquid are disposed in a layer on one surface of said flat transparent sheet, a flat opaque backing member is superimposed coextensively over said layer of encapsulated droplets, and means sealing marginal edge portions of said flat opaque backing member to said flat transparent sheet to enclose and support said beads between said flat transparent sheet and the flat backing member.

A patentee cannot, by means of the specifications, revive a claim that has been abandoned, *Schriber-Schroth Co. v. Cleveland Trust Co.,* 311 U.S. 211, 217–18, 61 S.Ct. 235, 85 L.Ed. 132 (1940).

The trial court found it unnecessary to determine whether the Patent was so entitled since it concluded that the patentee was barred by file wrapper estoppel from relying on the principle of equivalents. All of the 13 claims in the original application were dependent, either directly or indirectly, on Application Claim 1. This was limited to clauses a and b of Claim 1 in the Patent as issued. The Patent Examiner initially rejected all claims on the basis of prior art, to wit, Hodson Patent No. 3,585,-381 issued June 15, 1971. One of the applicant's arguments against this was the following, in regard to Application Claim 6 (now the full Patent Claim 1 quoted above):

Claim 6 was also rejected on Hodson under 35 U.S.C. 102, and applicant is at a loss to understand the basis for this rejection. This claim clearly specifies that applicant's transparent body is provided with a peripheral flange defining a recess within the body. Nowhere does Hodson disclose or suggest such a peripheral flange or recess within his member 4.

The Patent Office responded that Applicant Claim 6, among others, would be allowable if amended so as to be independent, but finally rejected Application Claims 1 to 5 and 9, saying

Hodson *et al.* disclose a laminated product wherein an encapsulated liquid-crystal member is bonded to, and embedded between an opaque backing sheet 1 and a transparent upper body member 4; see Figure 1. Whether the encapsulated liquid crystals are bonded to the surface of the flat transparent member 4 of Hodson *et al.* or whether they are embedded within said transparent member 4, as recited in applicants' claims is considered to involve a mere matter of choice and obvious expedient to the ordinary skilled laminating chemist.

In addition, Claim 9, see Footnote 7, *supra,* was specifically rejected on the following basis:

The polymeric adhesive binder 3 of Hodson et al would inherently serve to seal the marginal edge portions of the laminated product, shown in Figure 1 of the patent, in the manner recited in claim 9 herein.

In response the applicant submitted Application 6 as a new independent Claim, allowed as Claim 1.

As we said in *International Latex Corp. v. Warner Brothers Co.,* 276 F.2d 557, 565 (2 Cir.), *cert. denied,* 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47 (1960), citing many cases,

It is settled that the rejection of a claim forbids 'any interpretation of those secured which leaves them identical with that rejected' or any use of the doctrine of equivalents to that end.

James' patent solicitors succeeded in convincing the Patent Office that he had overcome the charge of obviousness in light of Hodson because his "transparent body is provided with a peripheral flange defining a recess within the body"—something which the accused rings do not have. File wrapper estoppel thus stands in the way of applying the doctrine of equivalents so that Patent Claim 1 will include a ring which accomplishes James' purpose of protecting the crystalline liquid against "destruction by contact with various solvents, excessive heat, and physical abrasion" by means other than a peripheral flange.

Appellant contests this on the basis that, in contrast to the usual case of file wrapper estoppel, Application Claim 6 (Patent Claim 1) was never itself narrowed by amendment, and points to the language of *Moore Business Forms, Inc. v. Minnesota Mining and Manuf. Co.,* 521 F.2d 1178, 1184 (2 Cir. 1975), quoted in the margin,[8] for the

---

8. In determining whether an estoppel applies, the court must consider whether an applicant abandoned or disclaimed coverage of certain processes or products in the course of securing its patent. Of primary importance in such a case are the original claims made by the applicant, the reasons given by the examiner for rejecting such claims, and the narrowing amendments made by the applicant in an attempt to secure approval of the patent. *See, e. g., Graham v. John Deere Co.,* 383 U.S. 1, 33, 86 S.Ct. 634, 15 L.Ed.2d 545 (1966). In the present case, the term free-flowing powder was not added by

proposition that this is a crucial distinction. That opinion should not be read to make this point all-important; immediately following the language quoted to us, the court also pointed out that there had never been an attempt to distinguish the claim being there sued upon from the prior art on the basis of the unique qualities of the feature as to which equivalence was being asserted—exactly what appellant is seeking to do here.[9] The rest of appellant's argument seems to be in substance that the Patent Office erred in rejecting James' initial claims since they were not in fact obvious in light of Hodson and since Application Claim No. 1 was already limited to the real invention, the encapsulation of the liquid "within said transparent body." We need not debate whether this is true. For an erroneous rejection by the Patent Office does not relieve, from the doctrine of file wrapper estoppel, an applicant who elects to acquiesce in it rather than pursue his other remedies. See *International Latex, supra,* 276 F.2d at 565.

While we hold that the judge correctly applied the doctrine of file wrapper estoppel to preclude resort to the principle of equivalents in this case, we doubt whether that principle would support a finding of infringement in any event. As is manifest from the foregoing, the essence of James' invention was not in the use of color-changing material in items of jewelry, but in devising a unique means for applying this material so as to seal it from external influences that would cause its deterioration. The evidence showed that the methods here claimed to be equivalent to those described in the Patent were used in jewelry making to place stones, some of them foil-backed, in bezels of the same shape, even when there was no crystalline material to seal; and that such means had been in use for that purpose prior to the application for the Patent. We accordingly see nothing that would call forth the policies protected by the doctrine of equivalents as described in *Graver Tank Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 607–08, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) and *Royal Typewriter Co. v. Remington Rand, Inc., supra,* 168 F.2d at 692; see also 7 Walker on Patents § 558 (1972) (2 ed. Deller); *International Harvester Co. v. Killefer Manuf. Co.,* 67 F.2d 54, 61 (9 Cir.1933).

Appellant's other principal ground for reversal is that the court should not have rendered a judgment of non-infringement in an action in which the patentee was not made a party, and the Patent was represented only by a non-exclusive licensee, see footnote 1, *supra.* Hattie Carnegie places great store on our decision in *Contracting Division, A. C. Horn Corp. v. New York Life Ins. Co.,* 113 F.2d 864 (1940), that a claimed infringer could not counterclaim for a declaration of non-infringement against a non-exclusive licensee without the presence of the patent owner since there was no "actual controversy" such as the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, requires. However, the *A. C. Horn* decision was soon distinguished in *A. L. Smith Iron Co. v. Dickson,* 141 F.2d 3 (2 Cir. 1944). Dickson, a non-exclusive licensee of a British patentee, advised A. L. Smith that the latter was selling products infringing the patent, that the patent owner had instructed that the patent was "to be protected at any cost," and that A. L. Smith's purchasers were "going to get into

---

**9.** amendment to narrow claim 8, but was contained in the initial Macaulay claim relating to producing microcapsules by chemical condensation, as well as in all the original Macaulay process claims. Thus we do not have a situation where an initial claim relating to chemical condensation, but not including the filtering and drying steps, was initially made by Moore, rejected by the patent examiner, and then narrowed by adding the filtering and drying steps.

**9.** We also note that the language of *Graham v. John Deere Co.,* 383 U.S. 1, 33, 86 S.Ct. 684, 702, 15 L.Ed.2d 545 (1966), cited in the passage from the *Moore* opinion quoted in the preceding footnote, is not only that "claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent," but also that "[c]laims must be read and interpreted with reference to rejected ones and to the state of the prior art."

trouble." Reversing a district court decision that had relied on *A. C. Horn*, this court held that Dickson was not entitled to have A. L. Smith's action for a declaration of invalidity dismissed because of the absence of the patent owner. Judge Learned Hand said:

> Yet, even though the Cocks company had done nothing more than license Dickson, the scales, so balanced, would tip to the plaintiff's side; for it would be obviously unfair to leave its business exposed to continuous indirect attack, merely to preserve the company's choice of forum— at least when, as here, the forum open to it is a court having jurisdiction over patents.

We find *A. L. Smith* very pertinent here. Clearly the evidence showed an actual controversy between plaintiffs and Hattie Carnegie; there is nothing in appellant's assertion that the district court lacked "jurisdiction" to proceed in the absence of the patent-owner. The question is whether the court properly exercised its discretion under F.R.Civ.P. 19(b). We think it did; see 3A Moore, Federal Practice ¶ 19.14 [2.–3] (1974). The Notice by which Hattie Carnegie precipitated the controversy stated that it would take immediate legal action "both individually and in consort with the licensor." Evidence that this assertion was not unauthorized by the licensor is furnished by the fact that only a fortnight later they did exactly what had been threatened, by jointly suing Gimbel's for infringement. Counsel representing Hattie Carnegie in this suit are acting both for it and for James in the infringement suit. The judgment of non-infringement will not be binding or work as a collateral estoppel on James (although it will, of course, be damaging as a precedent) unless he has controlled or substantially participated in the presentation, see Restatement of Judgment 2d § 83 (Tent. Draft # 2, 1975); there is simply nothing to support the assertion of appellant's counsel that, under *Blonder Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), any judgment of non-infringement in a patent action operates *in rem* and binds the world. While it is true that plaintiffs might have intervened in the infringement action against Gimbel's, it is equally true that James, who was well aware of this litigation and does not eschew the Southern District as a forum when that suits his purpose, could have defended here.

■ Beyond this major procedural claim, appellant mounts a variety of attacks upon the speed with which the court decided the case. We have already dealt with some of these and find no merit in the others. It probably is true that a judge less versed in patent law would have taken longer to reach a decision even on so clear a case as this. We agree that, except perhaps in cases of grave emergency, speed should not be a goal to be purchased at the cost of fairness. It was not so purchased here. The judge offered appellant an opportunity to produce additional evidence on infringement, with a temporary injunction being issued in the meanwhile as was justified on any view; appellant said it had none. Even now after the lapse of many months, appellant has not pointed to any material evidence it was foreclosed from offering or arguments it was prevented from making. When as here justice can be swift as well as sure, it attains its best. A court is fortunate to have a member who can understand and speak the arcane language of patent litigation as readily as ordinary English and can act, soundly and decisively, from a background of knowledge of patent law which most of us must tediously acquire, or reacquire, for each case.

Affirmed.