**The NARDA MICROWAVE CORPORATION,**
**Plaintiff-Appellant-Cross-Appellee,**

v.

**GENERAL MICROWAVE CORPORATION,**
**Defendant-Appellee-Cross-Appellant.**

**Nos. 663, 709, Dockets 81–7222, 81–7262.**

United States Court of Appeals, Second Circuit.

Argued Jan. 13, 1982.

Decided April 12, 1982.

Rehearing Denied May 14, 1982.

---

Frank W. Ford, Jr., New York City (Robert Neuner, James J. Maune, Brumbaugh, Graves, Donohue & Raymond, New York City, Eisenman, Allsopp & Strack, Woodbury, N. Y., of counsel), for plaintiff-appellant-cross-appellee, The Narda Microwave Corp.

Paul H. Blaustein, New York City (Benita J. Rohm, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, Morton C. Jacobs, Millman & Jacobs, Philadelphia, Pa., of counsel), for defendant-appellee-cross-appellant, General Microwave Corp.

Before OAKES, NEWMAN and WINTER, Circuit Judges.

OAKES, Circuit Judge:

This hotly contested—perhaps overly contested—litigation involves patents and devices in the field of microwave radiation detection. This field became of general importance to consumers only after the microwave oven became available in the late 1960s. Even before then, however, the detection of microwave radiation was important to the military and to the safety of its personnel; indeed one of the patents in issue arose out of an Air Force contract.

Three of the four patents in issue are held by The Narda Microwave Corporation (Narda), which commenced this action for their infringement against General Microwave Corporation (General) in the United States District Court for the Eastern District of New York, George C. Pratt, Judge. Narda's Patent No. 3,641,439 (the '439 patent) for a "Near-Field Radiation Monitor" (that is, a microwave-oven monitor) was held valid but not infringed by General's devices. The court found that Narda's second patent, No. 3,794,914 (the '914 patent), for a radiation detector employing thermocouples with resistive elements, was invalid because anticipated by the invention

embodied in General's Patent No. 3,931,573 (the '573 patent), even though the filing and issue dates of the '573 patent were later than those of the '914 patent. General's '573 patent was in turn held valid and infringed by Narda's monitoring devices. Both the Narda '914 and the General '573, as used in the companies' respective monitoring devices, measure microwave radiation over a broad spectrum of microwave activity. The court held the final patent involved in this appeal, Narda's Design Patent No. 211,588 (the design patent), which pertained to the design of Narda's probe, invalid under 35 U.S.C. § 102(b), though novel, because it had been on sale for more than one year prior to the patent's filing date.

We affirm regarding the validity but noninfringement of Narda's '439 patent and the invalidity of Narda's '914 patent. With respect to the district court's finding that General's '573 patent was infringed, we reverse on the basis of the doctrine of "file wrapper estoppel." We affirm the district court's finding of the invalidity of the Narda design patent, though on a different ground: lack of novelty.

## BACKGROUND

The frequency of radio (*i.e.*, electromagnetic) waves is measured in cycles per second, the preferred term for which is Hertz (Hz). The term "microwave radiation" is generally used to refer to radio waves of certain high frequencies. A megacycle or megahertz (MHz) is a unit of frequency equal to one million cycles per second. A gigacycle or gigahertz (GHz) is equal to one thousand megacycles.

Microwaves are given off not only by cooking ovens but also by industrial devices for drying materials, by radar and other communications devices used by the military, and by various other broadcasting devices. The radio frequency (rf) of microwaves varies enormously so that there is a broad band of microwave activity. The district court found as a fact that "[e]xposure to excessive amounts of microwave radia-

tion can cause severe damage to a human, including burning of the eyes and body."

Before 1968 some devices were available to monitor microwave radiation at points in the "far field" (that is, distant from the source of radiation). But those devices could not accurately measure microwave radiation in the "near field." The National Bureau of Standards (NBS) had worked unsuccessfully in the area of near-field radiation detection for five years prior to 1968, at which time the advent of microwave ovens greatly increased the need for a near-field radiation monitoring device. Manufacturers required a microwave-oven monitor in order to protect their potential consumers against excessive radiation and to protect themselves against potential products-liability actions. In October 1968 Congress enacted a law to establish standards governing the emission of hazardous radiation from electronic equipment.[1]

The growing need in the field also led the National Center for Radiological Health to convene a meeting of persons skilled in the art. At that meeting on July 31, 1968, Edward Aslan, an employee of Narda and the inventor of Narda's patents, described a far-field probing device that Narda had acquired from the Sperry Corp. As indicated by the minutes of the meeting, which were in evidence below, a skilled employee of NBS also spoke. He advised his audience of the compelling need for a probe that would be "lightly" or loosely coupled to the field, would not perturb the near field, and could be "metered" or measured through conventional signal-generating means, such as thin-film thermocouples, which would convert radio frequency waves to heat.

### I. *Narda's '439 Patent*

Following the July 31 meeting Aslan set to work to solve the problem posed by the NBS. In approximately one month he developed the prototype of the Narda Model 8100 portable microwave radiation detector, to which the '439 patent is specifically directed. The radiation detector consisted of a probe to absorb rf waves, connected to a

1. "The Radiation Control for Health and Safety   Act of 1968," 42 U.S.C. §§ 263b–263n.

meter. The central feature of the Model 8100 probe was its sensor assembly, which is described in the district court's finding set forth in the margin.[2]

Claim One of the '439 patent, the broader of its first two claims, was as follows:

A radiation detector comprising antenna means operative in response to an electric field to produce an electric current, including thermally and electrically conductive films forming a dipole; and a thin film thermocouple connected as a load to said antenna means, the hot junction of said thermocouple being formed by overlapping end portions of thin resistive strips of dissimilar metal films having a thickness that is small relative to the skin depth of the wave energy of said electric field, and the cold junctions of said thermocouple being formed by overlapping the other end portions of said thin resistive strips with said thermally and electrically conductive films; said thermocouple and said antenna means being substantially disposed within a plane.

The Model 8100 radiation detector made under the '439 patent was new in the art. It had a high range of accuracy and a high sensitivity to weak electromagnetic fields. Its sensor was attuned to the 2,450 MHz frequency at which most microwave ovens operated, but could be converted to operation at the 915 MHz frequency of the General Electric microwave oven by the attachment of antenna[3] extender strips to the base of the conical tip.

The Narda 8100 won an industrial research award as one of the one hundred outstanding new products introduced in 1969 and met with immediate commercial success. As the district court found, the device "was an important step forward in the measurement of microwave radiation, and was the first instrument that was satisfactory for accurately measuring rf. energy emitted from microwave ovens." The court held that the '439 patent, for which Narda applied on August 8, 1969, and which was issued on February 8, 1972, was valid as to both Claim One and the narrower Claim Two.

## II. Narda's '914 Patent

On November 19, 1971, before the '439 patent was issued, Narda filed a continuation-in-part of the original Aslan application. The continuation-in-part application, which issued as Patent '914 on February 26, 1974, disclosed '439 and further embodiments of it. In one of those embodiments, the sensor assembly was formed entirely of a single thermocouple made up of *resistive* films and without a separate antenna. That the films were resistive distinguished them from the conductive films to which the '439 claim referred, although the resistive films in the '914 claim were also partly conductive. In another embodiment, overlapping resistive films formed into thermocouples that simultaneously performed the receptor function and the transducer or sig-

---

2. The central feature of the Model 8100 is the sensor assembly which was constructed through thin film technology involving the deposition on a dielectric substrate of various metals by an evaporation process so as to create extremely thin films of those metals. The films were formed essentially *into two parts: a dipole antenna* consisting of copper, connected by silver to a *thermocouple* made of overlapping strips of bismuth and antimony. The thermocouple was placed in the same plane as the dipole antenna and terminated the antenna 'as a load'. The entire sensor element was approximately ¾ of an inch in length. An identical sensor element was positioned immediately above the original one, but perpendicular to it, in essentially the same plane, an arrangement that eliminated any problem of polarized electrical fields. The remainder of the invention followed rela-

tively conventional lines, adopting a probe format with the sensor assembly at one end of the probe, connected to a meter by semiconductive lead wires designed to draw off direct current generated by the antenna-thermocouple device.

(Emphasis added.) The tip of the probe, permitting operation of the sensor within two inches of the device being measured, was composed of styrofoam, which has the same electrical properties as free space.

3. An antenna is a conductive structure transmitting or receiving radio waves to or from space. Since AM radio waves have vertical polarization, automotive antennae are usually vertical; television radio waves are horizontal so that TV antennae have horizontal wires. A dipole is a simple antenna.

nal-measuring function. The trial court found that the '439 patent contemplated separate elements for the dipole antenna and the thermocouple while the '914 patent consisted of a thermocouple or a series of thermocouples that performed not only the signal-measuring function of the '439 thermocouple but also the receptor function of the '439 dipole antenna. Thus the patents were distinct and the '914 was not entitled to the earlier filing date of the '439.

## III. General's RAHAM Models 1 and 3

In late 1974 General introduced its RA-HAM Model 1 detector, which used the Model 81 probe based on General's '573 patent, discussed *infra*. The RAHAM Model 1 was similar in appearance to the Narda 8100 in that it used a foam spacer tip and a cable extending from the base of the probe to a meter. However, its sensor assembly included upper and lower dielectric substrates sandwiched between thermally conductive ceramic discs, on which were formed thin-film *resistive* strips of *connected thermocouples* arranged in zigzag arrays having perpendicular orientation. The overlapping resistive strips of dissimilar materials formed each thermocouple, with alternating points of contact forming hot junctions and cold junctions. Projections on the thermally conductive ceramic discs conducted heat away from the cold junctions. The thermocouples of the RAHAM Model 1 directly absorbed radiation without perturbing the field, and converted it to heat which in turn generated the current to be conducted through the resistive leads to the meter or measuring device. As in the Narda '914 patent, the RAHAM Model 1— and the similar Model 3 introduced in 1976 —had no separate dipole antenna connected to a thermocouple as a load but rather used serially connected thermocouples to perform both the receptor and the signal-generating functions. The district court found that the RAHAM radiation detectors did not infringe the Narda '439 patent, which described a conventional lossless dipole antenna using a thermocouple as a load.

## IV. General's '573 Patent

The General '573 patent, like the RA-HAM detectors and Narda's '914 patent, operated on a broad band by using a thermocouple array that performed both antenna and signal-generating functions. General applied for the '573 patent after Narda applied for the '914, and referred to the '914 as prior art. The '573 was actually conceived in May 1970, however, when General drew tentative plans and spent approximately $10,000 in development costs to prepare a submission to the Air Force.

On May 21, 1971, the Rome Air Development Center (RADC) awarded General a contract to produce a monitor with a frequency range of 20 KHz to 12.4 GHz. Narda had previously become aware of the proposed contract and expressed to the Air Force its view that such a monitor could not be built. Air Force personnel did not disclose the configuration or construction of the monitor that General proposed to develop, but General's technical proposal disclosed the concept of a broad-band radiation hazards monitor employing linked thermocouples to form resistive strips, essentially as described later in the '573 patent. The contract granted patent rights to the government and required General to notify the Air Force of any inventions conceived or reduced to practice under the contract and of the filing of any patent applications thereon.

In mid-1972 radiation monitors constructed by General were sent to the RADC and then to the NBS for final acceptance tests, which revealed that the monitors failed to meet the contract requirements below 600 MHz. General's efforts continued over the next eighteen months. During that time General did not disclose its application for the '573 patent in any of the research and development reports it filed with the government. On the contrary, General represented in a letter that "there were no inventions resulting from work on the referenced contract which reasonably appear to be patentable." When questioned by the government, however, General finally disclosed its patent application and the

government issued a royalty-free confirmatory license.

The Patent Office examiner responsible for prosecution of the '573 patent rejected Claims 1 to 4 and 14 to 42, citing the Aslan '914 patent. General then filed an amendment on October 2, 1974, in which it argued that the claims in its application were distinguishable over the Aslan patent. On May 5, 1975, General canceled the rejected Claim 1 and provoked an interference with the Aslan '914 patent by filing a continuation-patent application that asserted four claims copied from the '914. Interference was declared on May 18, 1976. Moving to dissolve the interference, Narda argued that two articles by Aslan describing the Narda Model 8100, and the filing for Narda's '439 patent, made the counts in interference unpatentable to General's inventor Hopfer under 35 U.S.C. §§ 102 and 103. The Board of Patent Interference granted Narda's motions and dissolved the interference without determining which party had the prior invention.

The district court found that Narda's '914 patent was invalid as anticipated by Hopfer's prior invention that became the basis for the valid '573 patent. The court also found that Narda's Models 8300 and 8600, which were substantially as described in the '914 patent, infringed General's '573.

### V. *Narda's Design Patent*

The design of Narda's probe, which the district court found to be "novel, distinctive and ornamental," included a conical tip and a cylindrical handle having three sections of different diameters and different lengths. One section served as a handle. The central section had the longest length and the smallest diameter. A copy of the design is printed below:

General's defense to infringement of the design patent was that Narda's Model 8100 probe, which incorporated the design, was on sale prior to March 23, 1969, one year before the patent's filing date.

Narda began efforts to sell the Model 8100 probe before the end of 1968. When the initial orders were taken the design, and more particularly the conical tip, had not yet been completed. Narda and its inventor Aslan later decided to incorporate a conical spacer tip on the 8100 probes which were to be delivered, and on or about December 30 Aslan signed a manufacturing drawing including the conical tip. On or about January 2, 1969, the conical tip was released for production and on March 22, 1969, the first two production probes were transferred into Narda's inventory. Deliveries to customers were made after April 1, 1969. The court concluded that the probe detectors incorporating the design covered by the design patent were on sale before March 23, 1969, and therefore held the design patent invalid under 35 U.S.C. § 102(b).

### DISCUSSION

#### I. *Narda's '439 Patent*

Narda's principal argument on appeal is that the district court erred as a matter of law in failing to accord its '439 patent a sufficiently broad range of equivalents. Narda maintains that the '439 patent discloses a broad and technologically important invention and is therefore entitled to a liberal construction, and that General's RAHAM Models 1 and 3 are fully equivalent to the invention claimed by the '439 patent. The argument must fail, however, in light of the district court's findings, which are not "clearly erroneous."

The district court found that the '439 patent utilized a dipole antenna formed of conductive films to which was connected a thermocouple formed of resistive films. The thermocouple array used in the RAHAM detectors and under the '573 patent, however, has no dipole antenna. The validity of the '439 patent did not depend on its use of an integrated antenna-thermocouple. In fact, Narda took a contrary position be-

fore the Patent Office. Its Claims 1 and 2 recited a dipole antenna means and a separate thin-film thermocouple as a load. Its Claims 11 and 13 likewise referred to antenna means. In arguing that his patent claims were not anticipated by Moles Patent No. 2,365,207, Aslan emphasized in an amendment that his invention combined a "distinct" antenna and a separate thin-film thermocouple. Another amendment similarly emphasized that the thermocouple and the antenna were separate elements. Narda now argues that the doctrine of equivalents should be applied to expand the scope of its '439 claims, but as Learned Hand, then a district judge, observed in *Quinn v. J. H. Faw, Inc.*, 235 F. 166, 169 (S.D.N.Y. 1916),

> [t]his case is the common one in which the applicant assents to conditions imposed in the Patent Office, and then, having got his patent, tries to expand it to cover exactly what he agreed it should not. Such a game of hide and seek the courts have always refused to allow. He had his remedy by appeal, and only by appeal, if the examiner was wrong.

*See also Keith v. Charles E. Hires Co., Inc.*, 116 F.2d 46, 48 (2d Cir. 1940). This holds equally true with respect to Narda's Claim 13, which it argues was canceled "without prejudice." *See Musher Foundation, Inc. v. Alba Trading Co.*, 150 F.2d 885, 888 (2d Cir. 1945). *See also Capri Jewelry Inc. v. Hattie Carnegie Jewelry Enterprises, Ltd.*, 539 F.2d 846, 852 (2d Cir. 1976).

## II. *Narda's '914 Patent*

■ Narda also asserts that its '914 patent is entitled as a matter of law to the benefit of the August 8, 1969, filing date of the '439 patent. It argues that the first element of the combination claimed by the '914 patent, namely "thin film orthogonal [right angled] thermocouple means forming dipoles," is supported by the specification of the '439 patent. We disagree. The '914 patent described a broad-band radiation monitor, while the '439 patent related only to narrow-band radiation detection. Like the General '573 patent, the '914 patent utilized resistive or "ohmic" interaction with the incoming radiation. The resistive strips had a sufficiently high resistance to provide the broad-band absorbing property with a low degree of reflectivity. The detector described in the '439 patent, however, incorporated highly conductive antennas with negligible resistance, which created frequency sensitivity, narrow-band operation, and reflection in the field. The use of high resistance in the '914 patent distinguished it significantly from Narda's '439. The Narda expert at trial and Narda's counsel on appeal consider the word "resistive" to mean essentially the same as "conductive," but this imprecision might well make Claim 1 of Narda's '439 so indefinite as to be invalid. We find that the distinction between conductive films and resistive films is significant, even though resistive films have some conductive qualities, and we conclude that the invention sought to be patented in the '914 was not disclosed in the '439. The new matter claimed in the continuation-in-part application therefore was not entitled to the patent filing date, 35 U.S.C. § 120, and the effective date of the '914 patent was its filing date, November 19, 1971.

## III. *General's 573 Patent*

■ The district court properly held the '914 patent invalid. The '914 was anticipated by the Hopfer invention, of which Narda became aware before it applied for the '914 patent. Indeed, Newsday had already carried a photograph of the thermocouple array that General had built and an electronics newsletter had announced General's "array of thin-film ... thermocouples." A General employee had discussed the General thermocouple array with Narda's chief engineer, who told Narda's new-products committee what he had learned as early as mid-September 1971. Through these means Narda learned of General's concept of a thermocouple array that did not use a conducting surface. Narda thereafter directed its own research away from the use of conductive antennae. Inasmuch as the '914 is not entitled to the filing date of the '439 patent, but must stand on its

own; no device had been built under the '914 patent before it was filed; and the '914 was anticipated by the Hopfer invention as disclosed by Newsday, the electronics newsletter, and the General employee, the '914 patent must fall.

### IV. File-Wrapper Estoppel

This does not mean, however, that Narda's Model 8300 and 8600 radiation detectors, which were produced under the invalid '914 patent, infringed General's '573 patent. General's patent is subject to the doctrine of file-wrapper estoppel.

It is a well-settled principle of patent interpretation that the extent of an invention is determined by the patent claims, together with the "file wrapper" history in the Patent Office. Under the doctrine of file-wrapper estoppel, a claim that has been narrowed for the purpose of obtaining the patent cannot be expanded to include that which was eliminated. See Graham v. John Deere Co., 383 U.S. 1, 33, 86 S.Ct. 684, 701, 15 L.Ed.2d 545 (1966). See generally 4 Deller, Walker on Patents § 234 (2d ed. 1965). A patentee who has limited a claim to circumvent a prior-art rejection by the examiner is foreclosed from later claiming an .interpretation or using the doctrine of equivalents effectively to reinstate the elements that were previously eliminated. See Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 518, 86 L.Ed. 736 (1942); Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 220–21, 61 S.Ct. 235, 239, 85 L.Ed. 132 (1940); Capri Jewelry Inc. v. Hattie Carnegie Jewelry Enterprises, Ltd., 539 F.2d at 851–52. The doctrine thus prevents a patentee from taking a position in the courts that contradicts the position he took in the Patent Office.

A review of the file-wrapper history of General's '573 patent reveals the following: General first applied for the patent in April 1972. On March 19, 1973, all sixteen of its claims were rejected. General amended its application and added five new claims on July 13, 1973. On October 15, 1973, the Patent Office allowed General's Claims 12 and 13, rejected Claims 1–4, 14–17, 19, and 21, and stated that Claims 5–11, 18, and 20 would be allowed if rewritten in independent form. In February and March of 1974 General again amended its application, sought reconsideration of the rejected claims, and added claims to its application. On April 18, 1974, the Patent Office allowed General's Claims 5–13 but rejected Claims 1–4 and 14–42, now citing "Aslan (914)" as prior art anticipating the claim under 35 U.S.C. § 102 or from which the claim was obvious under 35 U.S.C. § 103, over which '573 was unpatentable. On September 30, 1974, General canceled Claim 2, added two claims, and amended a number of other claims. In requesting reconsideration of the Patent Office's rejection of its claims, General repeatedly sought to distinguish its claim from "Aslan ('914)." On December 13, 1974, the Patent Office allowed Claims 5–13 but rejected the other claims "as unpatentable over Aslan (914)." In May and June 1975 General canceled Claim 1 and sought reconsideration of its remaining claims with some amendment. On June 23, 1975, the Patent Office allowed General's remaining claims.

It is clear from the foregoing that General, whether or not it acknowledged Narda's Patent '914 to be "prior art," narrowed its claims in order to obtain the issuance of a patent by distinguishing its claims from the '914. In a September 10, 1974 request for an extension of time to respond to the Patent Office's action of April 18, 1974, General did indicate that it "is now engaged in preparing a response to the Patent Office Action, but finds that a complete response will require the preparation of an Affidavit Under Rule 131 [37 C.F.R. § 1.131] to swear back of the prior art." Then on May 5, 1975, General advised the Patent Office that it was copying certain '914 claims under 37 C.F.R. § 1.205 for the purpose of provoking an interference to determine priority between the '573 and the '914. While General thus preserved its claim that the '914 was not prior art, General also represented to the Patent Office that the '573 was different from the '914.

**550**

Although there are only slight differences between Narda's Model 8300 and General's '573 patent,[4] under the doctrine of file-wrapper estoppel General may not claim that its '573 patent was infringed by Narda's Model 8300 and the derivative 8600. General narrowed and amended its claims in order to distinguish them from the '914. Therefore, General is now estopped from claiming an interpretation of '573 that extends to radiation detectors described in Narda's '914.

### V. *Narda's Design Patent*

■ Finally, with respect to the Narda design patent, we disagree with the district court that the design was novel or unique. We think it was obvious. 35 U.S.C. § 103. The handgrip looks like any handgrip. The tip over the sensor shaped like a cone, with a base diameter to accommodate the antenna strips and an altitude equal to the desired space, does not reflect any exceptional talent. Arrows, weathervanes, microphones and other items in common use have the same general shape. *See generally Lancaster Colony Corp. v. Aldon Accessories, Ltd.,* 506 F.2d 1197 (2d Cir. 1974); *G. B. Lewis Co. v. Gould Products, Inc.,* 436 F.2d 1176, 1178 (2d Cir. 1971).

### VI. *Conclusion*

The other numerous arguments made by both parties need not be addressed. The many motions filed by the parties seeking to strike or dismiss issues, briefs, appeals, etc. are denied as moot. Motions for leave to file briefs, answering papers, memoranda, etc. are granted.

Judgment in accordance with opinion; costs to neither party.

---

4. In the '914 patent—and in Narda's 8300 radiation monitor—the rows are spaced close to one another, whereas in the '573 patent and General's Model 81 probe the spacing between the rows is greater than the width of the individual rows. Furthermore, in Narda's monitors the free ends of the thermocouples that overlap to form cold junctions have film areas that are larger and therefore dissipate greater heat than the areas of the ends that overlap to form hot junctions. In the '573 patent and the Model 81 probe, thermally conductive ceramic discs engage the cold junctions of the thermocouples and conduct heat away from the free ends to maintain them at a lower temperature than the hot junctions in response to induced currents.